## Ledford v. Commonwealth.

(Decided Feb. 19, 1937.)

C. A. BACH for appellant.

B. M. VINCENT, Attorney General, and ROSCOE VINCENT, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

.Somewhere near 6 o'clock on the evening of April 22, 1936, the appellant, Herbert Ledford, a youth 20 years of age, shot and killed his uncle, Steve Turner, about twice his age, and for which he was later indicted, charged with murder. The fatal shooting occurred on a public road in a remote section of Breathitt county, Ky., known as "War Creek Road." It traverses the narrow valley through which the creek runs and along both the creek and the road there are a number of residences and also a rural store conducted by Noah Johnson. The place of the shooting was located about 200 yards from Johnson's store, and it happened apparently in the middle of the road where many of the neighborhood residents later discovered the victim's body. They found it lying on the left side with the face down with two bullet holes entering his back, one of which passed entirely through, while the other was lodged under the skin on the front part of the body and was taken out. There were two other shots penetrating the body from the left side, but more to the back than to the front. No shot, according to the great number of witnesses who testified, entered from the front.

At the trial defendant asked for a continuance because of the absence of a witness by whom he stated in his affidavit he could prove a threat made by deceased against him prior to the shooting. The Commonwealth's attorney agreed for the affidavit to be read as the evidence of the absent witness and the motion

for a continuance was overruled, but the affidavit was not introduced or offered to be read, and the only testimony heard at the trial on behalf of defendant was that given by himself alone. The jury convicted him of voluntary manslaughter with an attached punishment of confinement in the penitentiary for 21 years. His motion for a new trial was overruled and from the verdict and judgment pronounced thereon he prosecutes this appeal, urging through his counsel only one ground for a reversal, and which is—that the testimony of the Commonwealth, as a whole, was (a) insufficient to authorize a submission of the case to the jury, but if mistaken in that, then (b) that the verdict of guilty was flagrantly against the evidence and unsustained by it. All other alleged errors incorporated in the motion for a new trial are waived, but none of them possessed the remotest merit. The argued ground for a reversal as so subdivided calls for a sufficient statement of the substance of the testimony heard at the trial as will determine whether or not the argument has support.

There was a girl in the neighborhood by the name of Jane Johnson, who, unfortunately, appears to have thrown away and discarded all of her moral character. Appellant nevertheless was infatuated with her and became engaged to marry her; but his parents interposed serious objections, according to his testimony, neither of the parents, however, testifying in the case concerning that fact. Because of such alleged opposition defendant also stated that he and the girl had agreed on the week before the fatal day to meet at Noah Johnson's store the following Saturday—which was the fatal day—for the purpose of devising ways and means of circumventing such alleged parental objections. But instead of meeting at the store they met at a place a short distance therefrom on the road and seated themselves upon some present settee for the purpose of talking over matters. Beforehand defendant had equipped himself with a bottle of liquor and a 38 caliber pistol. A part of the liquor both he and the girl had consumed before decedent appeared about fifteen minutes after their arrival. He was traveling along the road and was equipped with a 32 caliber pistol in a scabbard and also a bottle of liquor—both being breeders of evil consequences. Thus the two participants in

the later tragedy were equipped and armed, with the favors of the girl as a possible casus belli. After decedent's arrival the three continued to imbibe, and it appears to have produced a spirit of restlessness on the part of the three and they began a series of walks up and down the road over a distance of, perhaps, a mile of its length and which they kept up until they became so intoxicated as to greatly lessen their power of locomotion, and which was particularly true of the deceased, who became so drunk as to be practically unable to walk, and he was partially assisted in his efforts to do so by the other two, upon whose bodies he leaned while engaged in the effort. At last they arrived shortly before the killing at a spot where the deceased announced that he could go no farther without something to eat.

The girl was dispatched to the store of Noah Johnson to procure some food, but prior to starting on that errand she had taken decedent's scabbard and pistol from around his body and buckled it on to hers, after which she shot all the shells in his pistol at nothing more than random, but when decedent was shot his pistol had been rebuckled upon his body but with no shells, either empty or loaded, in it, and which was the condition found by arrivals immediately after the shooting. The girl returned from Johnson's store with some crackers and sausage, and perhaps other articles of food, and the deceased insisted on sitting by the side of the road until he ate it, which he began doing. However, prior to that time defendant had endeavored to relieve decedent of his pistol, but to which he objected. Decedent was persuaded by defendant not to separate from him and the girl on one occasion during their aimless traveling of the road in the manner described, and not to go home with a neighbor. But during none of the time did he inform decedent that he (defendant) and the girl had in contemplation a trip to Powell county where they might be married without interference from defendant's parents, but which fact defendant testified was the purpose of his meeting the girl at that place on that occasion.

When the deceased sat down by the side of the road to eat his lunch that the girl had procured from Johnson's store it was near the time of the arrival of

a train at Oakdale, a neighboring depot (which train defendant stated he and the girl expected to take for their trip to Powell county), but the depot was three and a half miles from the place where the parties then were, and when it was impossible for them to walk to it in time to catch that train. Nevertheless, defendant stated that he and the girl waited for defendant to consume his meal "about four or five minutes," after which he said: "I told him we couldn't wait any longer we had to go on to Oakdale to catch the train. He asked what for and I told him we was going to Powell county to get married, when I told him that he jumped up wild and said I shouldn't take her down there and marry her, said he would kill me before I should take her.

"Q. What happened after that? A. I talked to him and the girl talked to him. I told him that he was my uncle and I was his nephew and he cussed me. He said God dam the nephew, a nephew wasn't any more to him than anybody else. I told him to set down and eat I wouldn't have no trouble with him for nothing in the world, I was a friend to him and always had been. Finally he set back down to eating again, I told him we was going and we started out. He jumped up and grabbed a rock and throwed it at me.

"Q. How far apart were you? A. Eight or ten feet.

"Q. Had you offered at any time there to harm him before he threw this rock at you? A. No sir.

"Q. Had the girl offered to harm him before he threw this rock at you? A. No sir.

"Q. Then what happened? A. I jerked my pistol and he threw his hand back on his hip like he was getting his pistol, I thought he had it pretty near out of the holster and I started shooting.

"Q. How fast did you shoot? A. As fast as I could.

"Q. How close were you to him? A. Six or seven feet."

He then stated that he fired the shots in what he believed to be his necessary self-defense. Decedent of course fired no shot, nor did he, according to the undis-

puted proof, draw any weapon. Immediately after the shooting was over defendant took his departure for another county in which he remained in seclusion for thirty days; while the girl ran screaming in the opposite direction. It was later discovered that she was also shot in the same melee, and which was evidently done by the defendant, but he nowhere claimed in his testimony that she was within range of any of the bullets that he fired at the deceased. A detailed statement as given by the witnesses covering the period when the three were meandering up and down the road for the space of some two hours or more would further tend to elucidate the situation and perhaps also furnish a greater comprehension of the truth; but the skeleton statement that we have given will, as we conclude, serve the purpose of determining the issue made by counsel in presenting his contentions supra.

Counsel cites a number of cases from this court declaring that circumstantial evidence is not sufficient to sustain a conviction when there is no greater convincing of guilt than there is of innocence. He likewise cites a number of cases wherein we have reversed judgments of conviction because flagrantly against the evidence and not supported thereby. We have no quarrel to make with any of those cases, the leading ones of which we have carefully read in connection with the consideration of this record. They will be found to present situations containing no fact or circumstance remotely pointing toward guilt, but all of which are perfectly consistent with innocence. Likewise, the cited cases contain testimony given by the defendant himself, frequently supplemented by testimony of disinterested witnesses, establishing a state of facts overwhelmingly disproving guilt, and which is consistent with normal conduct in similar situations and circumstances and in accord with the usual deportment of mankind. Counsel insists that this case presents one coming within the class of his cited ones in which we reversed convictions, and that it was the duty of the court at this trial to have so determined and sustained defendant's motion for a peremptory acquittal. But if not so, it is then vigorously insisted that the verdict is flagrantly against the evidence and for that reason the judgment should be reversed. However, counsel in his commendable manifested interest in his client's cause fails

to analyze the testimony of defendant himself and to discover that, applied literally as given by him, it fails to establish his self-defense plea.

To begin with there is absolutely no reason assigned why the deceased in his then helpless intoxicated condition was able to arise and pick up a rock and throw it at defendant, as he testified. But if it did happen it will be observed that the rock missed him, and he does not pretend that the deceased made any effort to obtain or throw another rock at him. Instead he immediately drew his pistol after the rock had safely passed by him, and it was not until then that the alleged demonstration of the deceased to do likewise occurred. Moreover, there is a dearth of reason why deceased would object to being left alone, or for defendant and his fiancee to depart for their train in order to consummate their engagement according to the alleged plans adopted by them. If it should be said that deceased was likewise enamoured of the girl, then the answer is that there is not a scintilla of evidence in the record to establish it, and that such a surmise is nothing more than a mere fiction, which is no more substantiated than another equally tenable conclusion that deceased may have said something concerning the proposed marriage to one or both of the parties thereto, which enraged defendant and caused him to kill his uncle; or that the latter may have expressed a determination to inform defendant's parents and to thereby block the contemplated trip to Powell county for the purpose of the marriage. Indeed, the latter conclusion, we conclude, is more feasible than the story related by defendant. But whatever may have been the superinducing cause for the shooting, it is clear that if it occurred in the way and manner testified to by defendant it was not justified under the established rule upholding and enforcing one's right of self-defense.

But there are additional undisputed facts in this case which counsel also appears to have overlooked. They are: (1) That defendant fled the scene and remained away for thirty days; (2) all of the shots were either in the back of deceased or in his left side, but nearer to his back than his front; (3) that decedent before and for some time prior to his seating himself for eating his lunch had been deprived of his pistol—it being worn by and in possession of the girl; (4) the

girl herself was shot, and in circumstances in which there is no fact pointing to an accident; but unless so done it would indicate that something happened at which defendant became offended toward both decedent and the girl and attempted to exterminate both of them. Finally it was proven that defendant had threatened some months before to kill the deceased "if he caught Steve Turner (deceased) with Jane Johnson." That threat, according to the witness, was made on the 27th day of December, 1935, not quite four months before the homicide, and the witness who testified to it named a number of others who were present, but none of whom was introduced, nor their testimony attempted to be obtained by the defendant, although he did deny making the threat.

In addition to all else that has been said, defendant soon after his return from his flight married Jane Johnson and thereby destroyed her competency as a witness in the case, either for or against him. If she herself had not been shot and would support defendant in his testimony it is not likely that he would have voluntarily rendered her incompetent as a witness by marrying her; but if her testimony would contradict that given by him, then the marriage so as to disqualify her from testifying for the commonwealth would be clearly beneficial to him.

We, therefore, see that the circumstances of the homicide, as detailed by defendant, are not only insufficient to establish his right of self-defense, but they are entirely out of accord with human experience as to probabilities in such circumstances, all of which is manifested by the enumerated facts and circumstances to which we have referred, thus rendering this case as one belonging to a different class than those involved in the cases relied on by defendant's counsel. Rather is it one containing facts and circumstances strongly tending to contradict the unsupported testimony of defendant himself in the more or less ragged account that he gave of the killing, and to be properly classified with the cases of Wilson v. Commonwealth, 208 Ky. 707, 271 S. W. 1055; Posten v. Commonwealth, 210 Ky. 594, 276 S. W. 545; Miller v. Commonwealth, 231 Ky. 527, 21 S. W. (2d) 840; Adkins v. Commonwealth, 245 Ky. 503, 53 S. W. (2d) 949. Those cases, and others cited in the opinions, apply the well-established

rule that where circumstances contradict the only evidence of an interested eyewitness, and reasonably point to the conclusion of guilt, a peremptory instruction for an acquittal should not be given, but the case should be submitted to the jury, and if followed by a verdict of guilty, it will not be considered as flagrantly against the evidence. Of course it will be gathered from reading those opinions that each case must depend upon its own peculiar facts, viewed in the light of human experience. When done, if the circumstantial testimony as a whole is as consistent with innocence as with guilt, then a conviction will not be upheld. But on the contrary, if such a survey of the entire case produces a well-founded conviction of guilt rather than of innocence, then a verdict of conviction will be sustained as not being flagrantly against the evidence. We are thoroughly convinced that the testimony in this case makes it one coming within the latter class, and for which reason the sole ground argued for a reversal of the judgment cannot be sustained.

Wherefore, it is affirmed.